198 F.3d 489 (4th Cir. 1999)
 UNITED STATES OF AMERICA, ex rel. Syed Rahman, M.D.; SYED RAHMAN, M.D., Plaintiffs-Appellees,
v.
ONCOLOGY ASSOCIATES, P.C.; ONCOLOGY SERVICES CORPORATION; DOUGLAS COLKITT, M.D.; JEROME DERDEL, M.D.; JOANNE RUSSELL; ONCOLOGY FUNDING CORPORATION; STONEBORO ONCOLOGY ASSOCIATES, P.C.; WARREN ONCOLOGY ASSOCIATES, P.C.; PHOENIXVILLE ONCOLOGY ASSOCIATES, P.C.; LITTLESTOWN ONCOLOGY ASSOCIATES, P.C.; LEHIGHTON ONCOLOGY ASSOCIATES, P.C.; EXTON ONCOLOGY ASSOCIATES, P.C.; BUCKS COUNTY ONCOLOGY ASSOCIATES, P.C.; GREENBELT CANCER TREATMENT CENTER, L.P.; DERDEL RANDALLSTOWN ONCOLOGY ASSOCIATES, P.C.; ATLANTIC RADIATION ONCOLOGY ASSOCIATES, P.C.; DERDEL UNION MEMORIAL ONCOLOGY ASSOCIATES, P.C.; DERDEL RIVERSIDE ONCOLOGY ASSOCIATES,
P.C.; DERDEL CHESAPEAKE ONCOLOGY ASSOCIATES, P.C.; OKEECHOBEE ONCOLOGY ASSOCIATES, P.A.; KEY WEST ONCOLOGY ASSOCIATES, P.A.; TAMPA ONCOLOGY ASSOCIATES, P.A.; TREASURE COAST ONCOLOGY ASSOCIATES, P.A.; LAUDERDALE LAKES ONCOLOGY, P.A.; ST. LAWRENCE ONCOLOGY P.C.; LIBERTY ONCOLOGY ASSOCIATES, P.C.; COMMUNITY RADIATION THERAPY ASSOCIATES, P.C.; KINGS PLAZA RADIOLOGY, P.C.; SOUTHERN NEW JERSEY CANCER TREATMENT; WILLIAMS COUNTY ONCOLOGY ASSOCIATES, P.C.; PARK ONCOLOGY ASSOCIATES, P.C.; PARKS ONCOLOGY ASSOCIATES, INCORPORATED; GHCC INCORPORATED, f.k.a. GREATER HARRISBURG CANCER CENTER, INC.; MGH CANCER TREATMENT CENTER, L.P.; ONCOLOGY SERVICES CORPORATION OF LAWNWOOD; KEYS CANCER CENTER LIMITED PARTNERSHIP; XCC INCORPORATED; GPCC, INCORPORATED; IRCC, INCORPORATED; KRTC, INCORPORATED; LVCC, INCORPORATED; MGHCC, INCORPORATED; MHCC, INCORPORATED; MARYLAND GENERAL CANCER
CENTER, INCORPORATED; ST. LUCIE COUNTY RADIATION ONCOLOGY, LIMITED; ONCOLOGY ASSOCIATES, P.C./INDIANA; ONCOLOGY ASSOCIATES, P.C./ALBEMARLE; DERDEL MARYLAND GENERAL ONCOLOGY ASSOCIATES, P.C.; DERDEL MGH ONCOLOGY ASSOCIATES, P.C.; KANKAKEE ONCOLOGY ASSOCIATES, P.C.; ONCOLOGY ASSOCIATES, P.C./HARRISBURG; PLEASANT HILLS ONCOLOGY ASSOCIATES, P.C.; ONCOLOGY ASSOCIATES, P.C./LEBANON; ONCOLOGY ASSOCIATES, P.C./SALISBURY; FLAGSTAFF ONCOLOGY ASSOCIATES, P.C.; FORT PIERCE ONCOLOGY ASSOCIATES, P.C.; GREENWAY ONCOLOGY ASSOCIATES, P.C.; GREATER PITTSBURGH ONCOLOGY ASSOCIATES, P.C.; MARLTON ONCOLOGY, P.C.; RANDALLSTOWN ONCOLOGY CENTER, INCORPORATED; WESTCHESTER ONCOLOGY, P.C.; CHESAPEAKE REGIONAL CANCER CENTER, INCORPORATED; UNION MEMORIAL ONCOLOGY CENTER, INCORPORATED; WILLIAMS COUNTY ONCOLOGY ASSOCIATES, INCORPORATED; TRI-STATE ONCOLOGY ASSOCIATES, INCORPORATED; HERITAGE HILLS MEDICAL, L.P.; RIVERSIDE ONCOLOGY; JEFFERSON RADIATION ONCOLOGY CENTER, L.P.; ALBEMARLE REGIONAL CANCER CENTER, L.P.; BROWARD RADIATION THERAPY CORPORATION; LAKE OKEECHOBEE CANCER CENTER, INCORPORATED; LAWNWOOD REGIONAL CANCER CENTER, L.P.; ONCOLOGY SERVICES CORPORATION OF KEY WEST, INCORPORATED; ONEONTA RADIATION ONCOLOGY, P.C.; ONCOLOGY SERVICES CORPORATION OF TAMPA, INCORPORATED; GREENBELT CANCER TREATMENT CENTER; BILLING SERVICES, INCORPORATED; NATIONAL MEDICAL FINANCIAL SERVICES CORPORATION; COLKITT ONCOLOGY GROUP, INCORPORATED; EQUIMED, INCORPORATED, Defendants-Appellants,
and
ATLANTIC RADIATION ONCOLOGY, L.L.C.; NORTHWEST RADIATION TREATMENT SERVICES, INCORPORATED; GREATER HARRISBURG CANCER CENTER, INCORPORATED; ONCOLOGY ASSOCIATES, P.C./LIFE CARE; ONCOLOGY ASSOCIATES, P.C./HERITAGE HILLS; ONCOLOGY ASSOCIATES, P.C./PITTSBURGH; CANCER CENTER OF NORTHERN ARIZONA PTR; SALISBURY RADIATION ONCOLOGY CENTER, INCORPORATED; MEDTREND HEALTH SYSTEMS, INCORPORATED; ST. LAWRENCE ONCOLOGY, P.C./OGDENSBURG; PMCB, INCORPORATED; ST. LAWRENCE ONCOLOGY, P.C./BROOKLYN; SKYLINE ONCOLOGY ASSOCIATES, P.C. PITTSBURGH, PA; MALONE ONCOLOGY ASSOCIATES, P.C., STATE COLLEGE, PA; NIXON EQUIPMENT CORPORATION, a corporation formed under the laws of Nevis State College, PA; THOMAS JEFFERSON REAL ESTATE CORPORATION, a corporation formed under the law of Nevis State College, PA; GEORGE WASHINGTON REAL ESTATE CORPORATION, a corporation formed under the laws of Nevis State College, PA; OAKTREE CANCER CARE, INCORPORATED, PITTSBURGH, PA; KEYSTONE ONCOLOGY, L.L.C., STATE COLLEGE, PA; EASTERN PENNSYLVANIA ONCOLOGY, L.L.C.; MASSACHUSETTS RADIATION ONCOLOGY SERVICES, P.C.; CHESTER COUNTY ONCOLOGY, L.L.C.; ROSEWOOD CANCER CARE, INCORPORATED; FLORIDA ONCOLOGY, P.A.; COASTAL ONCOLOGY, L.L.C., Defendants,
v.
HIGHMARK, INCORPORATED dba XACT MEDICARE SERVICES; NORIDIAN MUTUAL INSURANCE COMPANY dba BLUE CROSS BLUE SHIELD OF NORTH DAKOTA; AETNA INCORPORATED; BLUE CROSS BLUE SHIELD OF FLORIDA; HEALTH CARE SERVICE CORPORATION, a Mutual Legal Reserve Company; TRAILBLAZER HEALTH ENTERPRISES, L.L.C.; BLUE CROSS BLUE SHIELD OF MARYLAND, INCORPORATED; EMPIRE BLUE CROSS BLUE SHIELD; GROUP HEALTH INCORPORATED; BLUE CROSS AND BLUE SHIELD OF WESTERN NEW YORK, INCORPORATED; CIGNA CORPORATION;
CONNECTICUT GENERAL LIFE INSURANCE COMPANY; NATIONWIDE MUTUAL INSURANCE COMPANY, Third-Party Defendants.
 No. 99-1979 (CA-95-2241-H)
 UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
 Argued: September 22, 1999
Decided: November 8, 1999
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Alexander Harvey II, Senior District Judge.
 COUNSEL ARGUED: Paul Mark Sandler, FREISHTAT & SANDLER, Baltimore, Maryland, for Appellants. Peter Jeremy Smith, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. ON BRIEF: David W. Ogden, Acting Assistant Attorney General, Douglas N. Letter, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.
 Before WIDENER and NIEMEYER, Circuit Judges, and MICHAEL, Senior United States District Judge for the Western District of Virginia, sitting by designation.
 Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Widener and Senior Judge Michael joined.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 This appeal presents the question of whether the district court had authority to enter a preliminary injunction freezing the defendants' assets.
 
 
 2
 The district court entered a pre-judgment, asset-freezing injunction on the United States' allegations that the defendant oncology service providers defrauded the Medicare and CHAMPUS[1] programs and thereafter were engaging in complex reorganizations and transfers of assets to insulate themselves from liability. The injunction ordered the defendants not to "enter into any mergers or reorganizations and . . . not [to] sell, transfer, or assign assets outside of the ordinary course of business." Several months after entry of the injunction, when the Supreme Court handed down its decision in Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 119 S. Ct. 1961 (1999), the defendants filed a motion to dissolve the injunction, arguing that under Grupo Mexicano, the district court lacked authority to issue the injunction freezing their assets. The district court denied the motion to dissolve, concluding that because both money damages and equitable relief are sought in this case, the controlling authority is not Grupo Mexicano but Deckert v. Independence Shares Corp., 311 U.S. 282 (1940), and that to serve the public interest, the status quo should be maintained during the pendency of proceedings. For the reasons that follow, we hold that the district court had authority, under both its general equitable power and Federal Rule of Civil Procedure 64, to enter the injunction, and, accordingly, we affirm.
 
 
 3
 * On August 25, 1998, the United States filed its complaint in this case against Dr. Douglas Colkitt, his wife, and his business partner, Dr. Jerome Derdel. Doctors Colkitt and Derdel are physicians specializing in radiation oncology. The United States also sued more than 80 healthcare entities owned, operated, or controlled by Colkitt that provide diverse healthcare services in the area of radiation oncology (collectively referred to as "oncology service providers"). As subsequently amended, the complaint alleges that the individual defendants and the oncology service providers engaged in fraudulent billing schemes involving the Medicare Part B program from 1992 to 1997 and the CHAMPUS program from 1992 to 1996, causing losses to these programs in excess of $12 million. Specifically, the United States alleges that the defendants claimed reimbursement on bills for radiation oncology services that were not provided or ordered by the physician and on bills for unnecessary radiation oncology services, and that the defendants misrepresented the medical services rendered in order to obtain both higher and double reimbursements for services.
 
 
 4
 The United States' amended complaint includes eight counts filed variously on behalf of the Health Care Financing Administration (with respect to the Medicare program) and the Department of Defense (with respect to the CHAMPUS program) and names various of the defendants in each count. Counts I, II, and III assert claims under the False Claims Act for presenting false claims, presenting false statements, and conspiracy to submit false claims. Count IV alleges that the defendants unjustly enriched themselves. Count V alleges that payments were made to defendants under a mistake of fact. Count VI alleges that all actions of the defendants were actions of Colkitt under an alter ego theory. Count VII alleges fraudulent transfers under the Federal Debt Collection Procedures Act of 1990. And Count VIII alleges successor liability for specified corporations. The relief sought includes: (1) damages in excess of $12 million, trebled; (2) statutory penalties; (3) disgorgement of"interests, earnings, salaries, and profits" that were illegally obtained; (4) the voiding of fraudulent transfers; (5) the imposition of a constructive trust on "funds or property" that were proceeds of or purchases from illegal reimbursements; (6) prejudgment interest; and (7) such other relief as may be required. The United States estimates that the penalties and treble damages amount to approximately $86 million.
 
 
 5
 Several months after filing its complaint, the United States filed a motion for a temporary restraining order and a preliminary injunction to freeze the defendants' assets. The United States alleged that the defendants were making "some transfers . . . to the Caribbean Island of Nevis." It stated that it knew of six sales, but that one day before filing its motion, some additional entities "sold their equipment." The United States observed that the defendants were"selling the very assets of those centers that were allowing those centers to operate" and that several sales had involved millions of dollars for which the defendants had not yet received any moneys.
 
 
 6
 Following a hearing, the district court entered a temporary restraining order on March 12, 1999, which prohibited defendants from selling, transferring, or assigning any of their assets outside the ordinary course of business, or entering into any mergers or acquisitions, without obtaining permission from the United States or the district court. The injunction also required the defendants to place promissory notes from past sales of assets, as well as from any future sales that might occur, into an escrow account as security for any judgment. Finally, the injunction prohibited the defendants from transferring any funds outside the United States to conceal assets or avoid collection of any judgment. The injunction was to remain in effect until a hearing on the motion for a preliminary injunction could be held, and if none were held, it would remain in place during the pendency of the action. The defendants never requested a hearing on the injunction, nor did they appeal it, and they have agreed that the temporary restraining order should be treated as a preliminary injunction.
 
 
 7
 Three months after the injunction had been entered, when the Supreme Court issued its decision in Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 119 S. Ct. 1961 (1999) (holding that an injunction freezing assets may not be entered in an action for damages where no lien or equitable interest in the assets is claimed), the defendants moved to dissolve the injunction based on the Court's holding. Following a hearing on the motion, the district court denied the motion to dissolve, concluding that Grupo Mexicano "does not require that the TRO be dissolved." The court observed that Grupo Mexicano was limited to actions for money damages "in which no lien or equitable interest is claimed." As the district court observed:
 
 
 8
 In this particular case, both money damages and equitable relief are sought. In both the complaint and the amended complaint, the government has asked this Court for the "imposition of a constructive trust on all funds or property that can be demonstrated to be proceeds or profits made by all defendants through reimbursements obtained by fraud, false claims, or otherwise unlawful means, as equitable property of the defrauded Plaintiff United States of America.. . ." Count IV of the amended complaint asserts a state claim of unjust enrichment, and Count V seeks relief for payment under a mistake of fact. In Count VII of the amended complaint, the government seeks damages and injunctive relief under provisions of the [Federal Debt Collection Procedures Act].
 
 
 9
 The district court concluded that when equitable relief is involved in a case, the decision whether to issue an injunction freezing assets is controlled by Deckert v. Independence Shares Corp., 311 U.S. 282 (1940) (authorizing an injunction freezing assets to aid in granting the ultimate equitable relief of rescission). Applying Deckert to the circumstances in this case, the district court stated:
 
 
 10
 The government has alleged that fraudulent transfers have occurred and is prepared to present evidence in support of these allegations. The request has been made that the Court impose a constructive trust. Significant issues are therefore presented by the equitable aspects of this suit. Under these circumstances, the conditional freeze of assets imposed by the TRO is an appropriate exercise of this Court's equity jurisdiction.
 
 
 11
 This appeal was taken from the district court's order denying the motion to dissolve the injunction. See 28 U.S.C. § 1292(a)(1).
 
 II
 
 12
 The defendants contend that in light of Grupo Mexicano (prohibiting an injunction freezing assets in an action for money damages), the district court was without authority to issue a preliminary "asset freeze injunction" in this case. Recognizing that a court of equity may enter a preliminary injunction freezing assets and mandating the status quo "in aid of the recovery sought by[a] bill" to rescind a fraudulent sale and to obtain restitution of amounts paid, see Deckert, 311 U.S. at 289, the defendants argue that this is"overwhelmingly a suit at law for money damages under the [False Claims Act], rather than an equitable action like Deckert." They maintain that the United States' claims to equitable relief are "ancillary and incidental," whereas in Deckert, the "principal objects" of the suit were equitable relief. The defendants observe that if we were to apply the holding in Deckert to this case, any artful pleader could circumvent Grupo Mexicano "merely by `sprinkling' a bit of equity on a suit at law for money damages."
 
 
 13
 The United States claims that this case deals with"serious allegations of extensive fraud" involving millions of dollars and that the "defendants have attempted, since the inception of the suit, to dissipate assets in order to defeat any remedy that the United States is likely to obtain after trial." It notes that Grupo Mexicano is limited to suits for money damages where the plaintiffs have asserted no lien or equitable interest in the assets sought to be frozen. Because the United States seeks both money damages and equitable relief and because "[a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally," De Beers Consol. Mines, Ltd. v. United States, 325 U.S. 212 (1945), the United States argues that the district court was authorized to enter an asset-freezing preliminary injunction in this case where the United States seeks the imposition of a constructive trust over assets obtained through fraud. The United States argues additionally that the district court was authorized to "`go much farther both to give and withhold relief in furtherance of the public interest than [it is] accustomed to go when only private interests are involved,'" quoting Grupo Mexicano, 119 S. Ct. at 1971 (quoting United States v. First Nat'l City Bank, 379 U.S. 373, 383 (1965)).
 
 
 14
 The issue presented by these competing claims is whether the district court was authorized to enter a preliminary injunction freezing assets in furtherance of the alleged equitable relief claimed in an action where substantial money damages are also claimed. To resolve the issue, we must understand the Supreme Court's decisions in Deckert, De Beers, and Grupo Mexicano.
 
 
 15
 In Deckert, the plaintiffs brought suit under the Securities Act of 1933 claiming that the defendants were guilty of fraudulent misrepresentations and concealments in the sale of securities purchased by the plaintiffs and requesting rescission and restitution. See 311 U.S. at 289. The plaintiffs also requested the appointment of a receiver, alleging that the defendants were insolvent, that preferences to creditors were probable, and that their assets were in danger of dissipation and depletion. See id. at 285. On plaintiffs' request for an injunction freezing defendants' assets, the district court entered a preliminary injunction prohibiting any defendant "from transferring or otherwise disposing of" a specified amount of money. Id . at 286. The Supreme Court affirmed the district court's power to enter this injunction, noting that the "principal objects" of the suit were rescission and restitution and that the injunction freezing assets was proper where the preliminary injunction would be "in aid of the recovery sought by the bill." Id. at 289.
 
 
 16
 The principles of Deckert were recognized in De Beers, where the Court concluded that an asset-freezing injunction in that antitrust case was beyond the power of the district court because prohibiting the defendant from removing assets from the country pending adjudication on the merits was a matter "lying wholly outside the issues in the suit." 325 U.S. at 220. But the De Beers Court confirmed that a "preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally." Id.
 
 
 17
 Finally in Grupo Mexicano, the Supreme Court recognized, but distinguished, Deckert and approved De Beers, holding that in an action for money damages, the district court does not have the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed. See 119 S. Ct. at 1971-1975. In that case, which sought only money damages, investors purchased notes issued by Grupo Mexicano, a Mexican holding company involved in toll road construction. When Grupo Mexicano came into serious financial difficulties and defaulted on its notes, the investors sought a preliminary injunction restraining Grupo Mexicano from assigning its assets so that it would be able to pay its debts. The district court, finding that Grupo Mexicano was at risk of insolvency and that it planned to use its assets to satisfy other creditors, frustrating any judgment the investors might obtain, granted a preliminary injunction restraining Grupo Mexicano from transferring its assets, and the Second Circuit affirmed. Reversing the Second Circuit, the Supreme Court stated that general equitable authority does not authorize prejudgment injunctions in actions at law. Rather, "a general creditor (one without a judgment) ha[s] no cognizable interest, either at law or in equity, in the property of his debtor, and therefore could not interfere with the debtor's use of that property" prior to obtaining a judgment. Id. at 1968. The Court observed that "[t]he law of fraudulent conveyances and bankruptcy was developed to prevent [debt avoidance or preference]; an equitable power to restrict a debtor's use of his unencumbered property before judgment was not." Id. at 1970. The Court in Grupo Mexicano distinguished Deckert by noting that the preliminary injunction in Deckert was a reasonable measure to preserve the status quo pending final determination of the questions raised by the suit in equity. The Court said, "Deckert is not on point here because, as the Court took pains to explain, `the bill state[d] a cause [of action] for equitable relief,'" id. at 1971 (quoting, with alterations, Deckert, 311 U.S. at 288), but "[t]he preliminary relief available in a suit seeking equitable relief has nothing to do with the preliminary relief available in a creditor's bill seeking equitable assistance in the collection of a legal debt," id.
 
 
 18
 Grupo Mexicano's holding is carefully circumscribed, providing specifically that the general equitable powers of the federal courts do not include the authority to issue preliminary injunctions in actions solely at law: "This case presents the question whether, in an action for money damages, a United States District Court has the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed." 119 S. Ct. at 1964 (emphasis added). Again, "[W]e hold that the District Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages." Id. at 1975 (emphasis added). The Court was not presented with, nor did it choose to address, a situation in which equitable remedies were claimed.
 
 
 19
 From these controlling precedents, we draw several principles applicable to the case before us. First, where a plaintiff creditor has no lien or equitable interest in the assets of a defendant debtor, the creditor may not interfere with the debtor's use of his property before obtaining judgment. A debt claim leads only to a money judgment and does not in its own right constitute an interest in specific property. Accordingly, a debt claim does not, before reduction to judgment, authorize pre-judgment execution against the debtor's assets.
 
 
 20
 On the other hand, when the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the status quo pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested. This nexus between the assets sought to be frozen through an interim order and the ultimate relief requested in the lawsuit is essential to the authority of a district court in equity to enter a preliminary injunction freezing assets. Thus, the Court in Deckert entered an injunction freezing assets"in aid of the recovery" sought by the lawsuit. 311 U.S. at 289. In De Beers, the Court noted in a similar vein, "[a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally." 325 U.S. at 220. And finally, Grupo Mexicano held that because the plaintiff claimed no interest in the defendant's assets (by way of lien or an equitable interest), but rather claimed only a money judgment, the district court lacked authority to freeze or otherwise interfere with the defendant's assets. See 119 S. Ct. at 1975.
 
 
 21
 In addition, we must recognize that when interim equitable relief is authorized and the public interest is involved, the doctrine applies that "'[c]ourts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'" United States v. First Nat'l City Bank, 379 U.S. 378, 383 (1965) (quoting Virginian Ry. Co. v. System Fed'n No. 40, 300 U.S. 515, 552 (1937)).
 
 
 22
 To apply these principles, we must begin with an analysis of the claims in suit to determine whether they seek cognizable relief in equity involving assets of the defendant. We then proceed to determine whether the interim relief sought -in this case the preliminary injunction freezing assets -is a reasonable measure to preserve the status quo in aid of the ultimate equitable relief claimed. See First Nat'l, 379 U.S. at 385; Deckert, 311 U.S. at 289, 290. And in conducting this analysis, we may take into account that a court of equity has enhanced authority when the public interest is involved.
 
 
 23
 Turning to this case, the amended complaint demands damages in most of the eight counts, while Count IV alleges unjust enrichment and Count VII seeks to void fraudulent transfers. Moreover, the request for the imposition of a constructive trust applies to "all funds or property that can be demonstrated to be proceeds or profits made by the Defendants through reimbursements obtained by fraud." In support of the equitable relief claimed, the complaint alleges that through Oncology Associates, Inc., one of the entities that Colkitt owns and operates, Colkitt controlled and operated some 80 oncology service providers through complex inter-entity arrangements. Paragraph 64 of the complaint alleges,
 
 
 24
 All of the business entities identified herein are the alter ego of Colkitt and instrumentalities of Colkitt in conducting his own personal business activities and functioned solely to achieve the purposes of Colkitt. All of the business entities identified herein were controlled by and used by Colkitt without regard for their separate corporate or business identity.
 
 
 25
 And paragraph 62 alleges that "[t]he purpose of this complex corporate organization was to attempt to insulate Colkitt from any scrutiny of his business decisions and practices." Relying on these allegations, the amended complaint seeks to impose a constructive trust on moneys obtained by fraud and on assets purchased with the proceeds of fraud as "equitable property" of the United States, to void transfers among the entities that were fraudulent, and to require such assets to be "transferred to the United States."
 
 
 26
 Under the required analysis, we must determine whether these claims are cognizable in equity. The unjust enrichment count is recognized as equitable. See, e.g., Spring Constr. Co. v. Harris, 614 F.2d 374, 378 (4th Cir. 1980) (referring to the "equitable doctrine of unjust enrichment"). And a constructive trust, which is also demanded by the complaint, is "a tool of equity to prevent unjust enrichment." Capital Investors Co. v. Executors of Estate of Morrison, 800 F.2d 424, 427 (4th Cir. 1986). Such relief is granted "to provide just compensation for the wrong, not to impose a penalty." Hannon Armstrong & Co. v. Sumitomo Trust & Banking Co., 973 F.2d 359, 365 (4th Cir. 1992) (internal citations omitted). A constructive trust remains an equitable remedy "even though it might ultimately reach a fund of money." Dobbs, Law of Remedies § 2.6(3), at 157 (2d ed. 1993). The complaint's request to void transfers as fraudulent-a form of rescission -is also an equitable remedy. See Deckert , 311 U.S. at 288 (noting that a claim for rescission authorized by the securities laws "states a cause for equitable relief"); see also Restatement (Second) of Agency § 282 cmt. a (1958) (where a party transfers property to another party due to the fraud of the second party's agent, the first party is entitled to rescission). Accordingly, to the extent that the United States has alleged claims seeking to impose a constructive trust on assets as "equitable property" of the United States and to void fraudulent transfers of assets and have them transferred to the United States, the United States claims an equitable interest in the assets of the defendants. The nexus between the cognizable claims in suit and the assets of the defendant is thus alleged. "It is enough at this time to determine that the bill contains allegations which, if proved, entitle petitioners to some equitable relief." Deckert, 311 U.S. at 289.
 
 
 27
 We now turn to the preliminary injunction entered to determine whether it is a reasonable measure to preserve the status quo in aid of the claims in suit, see Deckert, 311 U.S. at 289, 290, or whether it grants interim relief of the same character as that which may be granted finally, see De Beers, 325 U.S. at 220. The injunction in this case freezes the defendants' assets, prohibiting the defendants from transferring them "outside of the ordinary course of business." It also prohibits the defendants from entering into mergers or reorganizations, which the United States alleged was a mechanism used to avoid the relief sought in the suit. Finally, it requires the defendants to place the consideration received from previous transfers into an escrow account. It is readily apparent that all of these mandates are designed to enable or to aid the district court in giving the relief requested in the complaint. To impose a constructive trust over assets obtained through fraud requires preservation of the assets, and to be able to void fraudulent transfers of assets obtained through fraud likewise requires that those assets be preserved.
 
 
 28
 It is clear that this case does not present the pure money damage claim addressed in Grupo Mexicano. On the contrary, its equitable claims fall squarely within the traditional equity powers recognized by Grupo Mexicano, De Beers, and Deckert. That money damages are claimed along with equitable relief does not defeat the district court's equitable powers.[2] Under modern pleading rules, claims in law and equity may be asserted in a single civil action, see Fed. R. Civ. P. 2, and relief may be demanded in such an action "in the alternative or of several different types," Fed. R. Civ. P. 8(a). Of course, by force of the same principles, these pleading rules do not abolish the substantive requirements for obtaining relief, and a remedy in equity remains justified only when otherwise authorized and when legal remedies are inadequate. See Grupo Mexicano, 119 S. Ct. at 1968.
 
 
 29
 The justification for a preliminary injunction in this case is heightened by the fact that the public interest is at stake. In First National, the public interest was represented by $19 million in taxes allegedly owed the United States by a foreign corporation. 379 U.S. at 379. Here, it lies in the $12 million allegedly diverted from the Medicare and CHAMPUS programs through the defendants' fraud. See also Virginian Ry. Co., 300 U.S. at 552 (1937) ("More is involved than the settlement of a private controversy without appreciable consequences to the public."); Pennsylvania v. Williams , 294 U.S. 176, 185 (1939) ("A court of equity . . . in its discretion may refuse to protect private rights when the exercise of its jurisdiction would be prejudicial to the public interest, or deny relief upon performance of a condition which will safeguard the public interest and secure substantial justice to the complainant.") (citation omitted); Central Kentucky Natural Gas Co. v. Railroad Comm'n of Kentucky, 290 U.S. 264, 271 (1933) ("The power of a court of equity . . . may . . . protect temporarily the public interest while its decree is being carried into effect."); City of Harrisonville v. Dickey Clay Mfg. Co., 289 U.S. 334, 338 (1933) ("Where an important public interest would be prejudiced, the reasons for denying the injunction may be compelling").
 
 
 30
 Accordingly, we conclude that the district court was authorized by its traditional equitable power to issue a preliminary injunction in this action freezing the assets of the defendants.
 
 III
 
 31
 While the district court did not rely on Federal Rule of Civil Procedure 64, resting its decision instead solely on the equitable power of the court recognized in Deckert, the United States contends that the preliminary injunction entered by the district court was also authorized by Rule 64 and the law of Maryland incorporated by the Rule.
 
 
 32
 The defendants, on the other hand, argue that Rule 64 does not provide authorization for the district court's order because the Rule is not sufficiently broad to include injunctive relief that may be authorized by state law.
 
 
 33
 The pertinent provisions of Rule 64 provide:
 
 
 34
 At the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held . . . . The remedies thus available include arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies, however designated and regardless of whether by state procedure the remedy is ancillary to an action or must be obtained by an independent action.
 
 
 35
 The defendants argue that a preliminary injunction to freeze assets is not a remedy "providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action." (Emphasis added). We believe that this contention reads Rule 64 too narrowly.
 
 
 36
 In the context of the Fourth Amendment's prohibition against unreasonable searches and seizures, the Supreme Court has defined the seizure of property as "some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113 (1984). It would appear that this definition is likewise suitable for Rule 64. Even though the core of the Rule focuses on well-recognized forms of seizures such as attachment, the Rule's language is not so tightly circumscribed. It provides for the adoption of "all" state remedies providing for the seizure of property "for the purpose of securing satisfaction of the judgment ultimately to be entered," including not only attachments but also "other corresponding or equivalent remedies, however designated." Fed. R. Civ. P. 64 (emphasis added). This language undoubtedly aims substantively at the control of property for the satisfaction of a judgment rather than at a particular writ or form of proceeding. For example, under Maryland law, an order freezing assets is not, in any significant way, substantively distinguishable from levies for attachment. Property is attached and brought into the custody of the court simply by posting real property or affixing notices to personal property while leaving the property in its place. See Md. Rule 2-642 (Writ of execution Levy). Stripped of its labels, therefore, a seizure by attachment in Maryland occurs when notice is placed on the property indicating it is in custodia legis until further action is taken or order given. See Md. Rule 2-643 (Release of property from levy). Just as that "seizure" is a "meaningful interference with an individual's possessory interests," so too would be a court order directing that assets remain in place until further order. Thus, when a court directs that assets be frozen pending further order, that form may be categorized a seizure. Rule 64 intended to incorporate all rules involving seizures to secure judgments or "other corresponding or equivalent remedies, however designated" to secure judgments.
 
 
 37
 Several other circuits have reached the same conclusion. In Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A., 143 F.3d 688, 692 (2d Cir. 1998), rev'd on other grounds, 119 S. Ct. 1961, the Second Circuit "recognized that injunctive relief may be granted under Rule 64 if authorized by the applicable state law." See also Inter-Regional Fin. Group, Inc. v. Hashemi, 562 F.2d 152, 154 (2d Cir. 1977) (holding that Rule 64 includes Connecticut's prejudgment remedy of attachment as well as injunctions in aid of attachment). Similarly, in FDIC v. Antonio, 843 F.2d 1311, 1313-14 (10th Cir. 1988), the Tenth Circuit utilized Rule 64 in applying Colorado state law which authorized prejudgment injunctive relief, and in Lechman v. Ashkenazy Enterprises, Inc., 712 F.2d 327, 330 (7th Cir. 1983), the Seventh Circuit affirmed the grant of a temporary restraining order under Rule 64 because it approximated an attachment and clearly was issued "for the purpose of securing satisfaction of the judgment ultimately to be entered".
 
 
 38
 The defendants argue that language in Grupo Mexicano supports the notion that Rule 64 does not embrace state equitable injunctions. The Court noted: "The remedy sought here could render Fed. R. Civ. P. 64, which authorizes use of state prejudgment remedies, a virtual irrelevance. Why go through the trouble of complying with local attachment and garnishment statutes when this all-purpose prejudgment injunction is available?" 119 S. Ct. at 1973. This reference, however, does not suggest that state law remedies are no longer available under Rule 64. It simply recognizes that it would be easier for a party to petition the court to issue a preliminary injunction from its general equitable powers than to invoke state law and meet its requirements.
 
 
 39
 Accordingly, we conclude that the scope of Federal Rule of Civil Procedure 64 incorporates state procedures authorizing any meaningful interference with property to secure satisfaction of a judgment, including any state-authorized injunctive relief for freezing assets to aid in satisfying the ultimate judgment in a case.
 
 
 40
 Maryland recognizes a "prejudgment attachment type injunction." Teferi v. DuPont Plaza Assocs., 551 A.2d 477, 481 (Md. Ct. Spec. App. 1989). In Teferi, the trial court granted an employer's motion for an interlocutory injunction preventing an employee suspected of embezzlement from transferring or otherwise disposing of his assets prior to final judgment. The court upheld this injunction based on the substantial likelihood that fraud was committed by the defendant and that the assets were fraudulently obtained, and the probability that the defendant would dispose of assets before judgment. Id. at 481, 482. The Teferi court applied the principles established earlier in Levitt v. Maryland Deposit Insurance Fund Corp., 505 A.2d 140 (Md. Ct. Spec. App. 1986).
 
 
 41
 In Levitt, the Maryland Deposit Insurance Fund Corporation ("MDIF") sued individuals, partnerships, and entities involved in a failed savings and loan. MDIF's complaint, "while grounded in law, sought equitable relief" of an accounting, constructive trust or equitable lien, and restitution. 505 A.2d at 142. The trial court entered an interlocutory injunction to prevent the defendants from dissipating their assets pending a final determination. In approving the injunction, the court held that "when fraud is alleged and the facts as pleaded indicate a substantial likelihood of fraud, as well as the probability that the defendants will, before judgment, dispose of assets fraudulently acquired, a court has jurisdiction to enjoin the defendants' dissipation of assets." Id. at 147.
 
 
 42
 These principles applied by the Maryland courts for freezing assets pending trial are not unlike the equitable power that we have identified in Part II, above. Nonetheless they provide an additional basis, through Federal Rule of Civil Procedure 64, to authorize the district court to enter the preliminary injunction freezing assets.
 
 IV
 
 43
 The injunction appealed to us was entered as a temporary restraining order following notice and hearing (limited to the oral argument of counsel). At the hearing, the district court and the parties anticipated that discovery would follow and that a further hearing on the facts would be held to determine whether a preliminary injunction should issue. For strategic reasons, the defendants later elected not to proceed with a hearing but to leave the temporary restraining order in place indefinitely as a preliminary injunction. See Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 422 (4th Cir. 1999) ("[I]f a temporary restraining order is continued indefinitely, it will be evaluated on appeal as if it were a preliminary injunction").
 
 
 44
 After Grupo Mexicano was decided in June 1999, however, the defendants moved to dissolve the preliminary injunction as no longer authorized. When the district court rejected this argument, the defendants appealed on the narrow legal question of whether, in light of Grupo Mexicano, an injunction freezing assets is legally authorized in a case where both money damages and equitable relief are requested. We have limited this opinion to address the district court's authority in such a circumstance.
 
 
 45
 At oral argument, counsel for the defendants candidly confirmed that the defendants were not challenging, in this appeal, the absence of facts or factual findings by the district court because the defendants deliberately elected not to proceed with a preliminary injunction hearing. They agreed that in resolving the legal issues raised on appeal, we are to accept the United States' allegations of fact as true, of course without holding the defendants to that assumption for purposes of further proceedings or trial.
 
 
 46
 By affirmance in this case, therefore, we do not foreclose defendants' right to a hearing and to factual findings on the injunction. Indeed, the defendants are entitled to have a hearing and to have the court "set forth the findings of fact and conclusions of law which constitute the grounds of its action." Fed. R. Civ. P. 52(a); see also Hoechst, 174 F.3d at 423 (remanding where injunction order "makes no significant factual findings and states only that the court deems the issuance of the injunction `necessary and proper'"); United States v. Cohen, 152 F.3d 321, 326 (4th Cir. 1998) ("The factual basis for the injunction or attachment order, whatever the same may be called, must be set forth with particularity in accordance with Rule 65"). And in the absence of factual findings justifying a preliminary injunction, we would otherwise remand the case to the district court specifically to hold the hearing and to make such findings. See Cohen, 152 F.3d at 326 ("[w]e will not presently vacate the preliminary injunction but remand this case so that the district court may have opportunity to make the fact findings required"). We will leave for further proceedings in the district court the question of whether the defendants will wish to have a hearing and factual findings or whether they will waive those rights.
 
 
 47
 For now, we hold narrowly that based on the nature of the equitable claims asserted by the United States, the district court had equitable power to issue the injunction that was entered in this case on March 12, 1999.
 
 AFFIRMED
 
 
 Notes:
 
 
 [1]
 The Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) (now called the TRICARE program) provides federal health benefits to eligible dependents of members of the uniformed services.
 
 
 [2]
 We note that pre-Grupo Mexicano decisions in other circuits have sustained preliminary injunctions where both legal and equitable remedies were sought. See, e.g., Levi Strauss & Co. v. Sunrise Int'l Trading Inc., 51 F.3d 982, 987 (11th Cir. 1995) (concluding that "the district court had the authority to freeze those assets which could have been used to satisfy an equitable award of profits" in action raising claims for, inter alia, trademark infringement and racketeering, and seeking a temporary restraining order, an entry inspection of appellants' business premises, preliminary and permanent injunctions, and damages); Republic of the Philippines v. Marcos, 862 F.2d 1355, 1364 (9th Cir. 1988) (court had authority to issue preliminary injunction to "prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies" where plaintiffs brought RICO claims and sought a constructive trust); Federal Savings & Loan Ins. Co. v. Dixon , 835 F.2d 554, 557 (5th Cir. 1987) (upholding preliminary injunction when the complaint "requested equitable relief in the form of restitution, an accounting, a constructive trust, and injunctive relief, as well as legal relief in the form of damages"); USACO Coal Co. v. Carbomin Energy, Inc., 689 F.2d 94 (6th Cir. 1982) (preliminary injunction authorized by court's inherent equitable powers in an action asserting claims for treble damages under RICO, breach of fiduciary duties, common law fraud, and breach of contract).